441 F.Supp. 955 (1977)
ASSOCIATED GENERAL CONTRACTORS OF CALIFORNIA, a nonprofit corporation, Engineering Contractors Association, a nonprofit corporation, American Subcontractors Association, a nonprofit corporation, Los Angeles County Chapter, National Electrical Contractors Association, Inc., a nonprofit corporation, Steve P. Rados, Inc., a corporation, Griffith Company, a corporation, Gordon H. Ball, Inc., a corporation, Stoddard Enterprises, a sole proprietorship, and Granite Construction Company, a corporation, Plaintiffs,
v.
SECRETARY OF COMMERCE OF THE UNITED STATES DEPARTMENT OF COMMERCE, U. S. Department of Commerce, Los Angeles County, a body corporate and politic, Los Angeles County Board of Supervisors, Los Angeles Flood Control District, Los Angeles County Engineer, Facilities Department of Los Angeles County, City of Los Angeles, a Municipal Corporation, Los Angeles City Council, Department of Recreation and Parks of the City of Los Angeles, and Department of Public Works of the City of Los Angeles, Defendants.
Civ. No. 77-3738-AAH.
United States District Court, C. D. California.
November 2, 1977.
*956 *957 *958 Ronald A. Zumbrun, John H. Findley and Sandra R. Johnson, Pacific Legal Foundation, Sacramento, Cal., and Lawrence H. Kay, Associated Gen. Contractors of California, Sacramento, Cal., for plaintiffs.
Peter H. Kane, Asst. U. S. Atty., Los Angeles, Cal., and Deborah P. M. Seymour, Trial Atty., Employment Section, Civ. Rights Div., U. S. Dept. of Justice, Washington, D. C., for federal defendants, Secretary of Commerce of the United States, and Dept. of Commerce.
Richard L. Landes, Deputy County Counsel, Los Angeles, Cal., for county defendants, Los Angeles County, Los Angeles County Bd. of Supervisors, Los Angeles Flood Control Dist., Los Angeles County Engineer and the Facilities Dept. of Los Angeles County.
John F. Haggerty, Asst. City Atty., Los Angeles, Cal., for city defendants, City of Los Angeles, Los Angeles City Council, Dept. of Recreation and Parks of the City of Los Angeles, and Dept. of Public Works of the City of Los Angeles.
DECISION AND ORDER (GRANTING DECLARATORY AND INJUNCTIVE RELIEF AGAINST "RACE QUOTA" SYSTEM FOR FEDERAL GRANTS TO LOCAL LOS ANGELES AGENCIES)
HAUK, District Judge.
This matter arises upon plaintiffs' complaint for declaratory and injunctive relief based upon the alleged unconstitutionality of Section 103(f)(2) of the Public Works Employment Act of 1977, Pub.L.No.95-28, 91 Stat. 116-121, 42 U.S.C. § 6705(f)(2), which requires that 10 percent of the amount of each federal grant applied for under the Act be expended for "minority business enterprises."[1] The Act has been implemented by rules and regulations[2] issued by the Secretary of Commerce under the authority given to him in the original Local Public Works Capital Development and Investment Act of 1976, 42 U.S.C. §§ 6701-6735, which was amended by the Public Works Employment Act of 1977. Plaintiffs seek declaratory judgments that the Department of Commerce and Secretary of Commerce's (Federal Defendants) enforcement of the minority business enterprises provisions of Pub.L.No.95-28 and the regulations promulgated thereunder, as well as the policies of the City and County of Los Angeles and their agencies named defendants (Local Defendants) of devising, approving, advertising, and awarding bids in accordance with the provision of the statute and regulations, violated and violate plaintiffs' rights under the Fifth Amendment to the United States Constitution. Plaintiffs also sought injunctive relief, by way of a temporary restraining order, order to show cause why a preliminary injunction should not be granted, and a permanent injunction, restraining all defendants from enforcing and complying with the said minority business enterprises provisions.
After the October 6, 1977, initial hearing, this Court issued its temporary restraining order, extended it for an additional ten days, and set the hearing on the preliminary injunction for October 31, 1977. On October 21, 1977, the Federal Defendants filed a motion for summary judgment, for which motion an application shortening time to notice the motion to October 31, 1977, was properly made and approved. See Local Rules 3(e) and 3(f), Central District of California. The Local Defendants and the plaintiffs have orally made and *959 joined in the motion for summary judgment by their own motions and counter motions for summary judgment, whereupon the Court proceeded to hear and rule by consolidating the hearing on the preliminary injunction with the hearing on the merits on the permanent injunction, by way of hearing the motions and counter motions for summary judgment. Fed.R.Civ.P., Rule 65(a)(2).

I

STATUTORY BACKGROUND
The Local Public Works Capital Development and Investment Act of 1976, Pub.L.No.94-369 (July 22, 1976), 90 Stat. 999-1012, 42 U.S.C. §§ 6701-6735, with its authorization of $2 billion (42 U.S.C. § 6710) (hereinafter "LPW Act"), for the implementation of which Congress appropriated $2 billion in Pub.L.No.94-447 (Oct. 1, 1976), was enacted for the purposes of alleviating the problem of nationwide unemployment and stimulating the national economy by assisting state and local governments to build badly needed public facilities. See H.R.Rep.No.94-1077 re Pub. L.No.94-369, 94th Cong., 2d Sess. (1976).[3] The program was to be administered by the Secretary of Commerce acting through the Economic Development Administration (hereinafter "EDA"), which distributed program funds for construction of public works projects to state and local government applicants. In order to expedite the initiation of construction projects contemplated by the LPW Act, Congress provided that the Secretary shall make a final determination upon each application within 60 days of receipt, with failure to take action within the prescribed period deemed to be approval [42 U.S.C. § 6706]; that the Secretary shall prescribe any rules and regulations deemed necessary to carry out the provisions of the LPW Act within 30 days of its enactment [42 U.S.C. § 6706]; and that on-site labor must begin within 90 days of project approval if funds are available [42 U.S.C. § 6705(d)]. Between October 26, 1976, and February 9, 1977 ("Round I"), approximately 2000 projects were approved and the appropriate Federal grants made, exhausting the $2 billion originally authorized and appropriated.
On May 13, 1977, Congress enacted the Public Works Employment Act of 1977, 91 Stat. 116-121, Pub.L.No.95-28 (hereinafter the "PWE Act"),[4] amending the LPW Act. The PWE Act (denoted "Round II") was designed to correct certain inadequacies of Round I and to increase funding for public works projects. By the PWE Act of 1977, a total of $6 billion was authorized to be expended in carrying out Round I and Round II under the provisions of the PWE Act, Pub.L.No.95-28, § 109 (May 13, 1977), of which an additional $4 billion was appropriated by Congress, Pub.L.No.95-29, Chap. III (May 13, 1977).[5] Congress remained aware of the importance of the infusion of Federal funds into the depressed construction industry, H.R.Rep.No.95-20, 95th Cong., 1st Sess. 1-2 (1977),[6] and, seeking to avoid any unnecessary delay in the implementation of the PWE Act, added the provision in the PWE Act that the Secretary shall not consider any application submitted subsequent to December 23, 1976, Pub.L.No. 95-28, § 107(h)(1) (May 13, 1977), in addition to retaining those deadlines originally set forth in 42 U.S.C. §§ 6705(d), 6706.
Included in the PWE Act was the following provision:
"(2) Except to the extent that the Secretary determines otherwise, no grant shall be made under this Act for any local public works project unless the applicant *960 gives satisfactory assurance to the Secretary that at least 10 per centum of the amount of each grant shall be expended for minority business enterprises. For purposes of this paragraph, the term `minority business enterprise' means a business at least 50 per centum of which is owned by minority group members or, in case of a publicly owned business, at least 51 per centum of the stock of which is owned by minority group members. For the purposes of the preceding sentence, minority group members are citizens of the United States who are Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts." Pub.L.No.95-28, 91 Stat. 117, Sec. 103(f)(2).[7]
This Minority Business Enterprises ("MBE") provision was introduced on the House floor during debate and was intended ostensibly to remedy the situation in which "The average percentage of minority contracts, of all Government contracts, in any given fiscal year is 1 percent1 percent." 123 Cong.Rec. p. H-1437-8 (daily ed. February 24, 1977).[8] Economic Development Administration Guidelines for implementation of the MBE provision indicate that "[w]hen prime contractors are selected through competitive bidding, the Grantee [state or local government] must require that each bid include a commitment to use at least 10 percent of the contract funds for MBEs . . .. In the case of projects involving more than one contract . . . some of the contractors may themselves be MBEs . . .." MBE Guidelines,[9] pp. 8, 9.
Among the rules and regulations promulgated by the Secretary pursuant to his authority to prescribe necessary regulations [42 U.S.C. § 6706] is the provision that the MBE requirement may be waived as to any grant for which the Assistant Secretary determines that the ten percent set-aside cannot be filled by minority businesses located within a reasonable trade area. Reg. 317.19(b)(2), 42 Fed.Reg. 27432, 27434-5 (May 27, 1977.[10] And the EDA Guidelines elaborate to some extent:
"The Grantee must demonstrate that there are not sufficient, relevant, qualified minority business enterprises whose market areas include the project location to justify a waiver. The Grantee must detail in its waiver request the efforts the Grantee and potential contractors have exerted to locate and enlist MBEs. The request must indicate the specific MBEs which were contacted and the reason each MBE was not used. EDA will consider the degree to which the Grantee and potential contractors have used available referral sources and related assistance in evaluating waiver requests." MBE Guidelines, pp. 13, 14.[11]

II

STATEMENT OF FACTS
Under Round II, and by September 30, 1977, the Secretary of Commerce had granted and obligated the entire $4 billion PWE Act authorization and the appropriation by *961 Public Law 95-29[12] including $29,782,108 for Los Angeles City projects, and $28,109,085 for Los Angeles County projects. Bid openings for these projects were to commence on October 7, 1977; however, because of the issuance of the temporary restraining order, no contracts have been awarded under Round II.
Plaintiffs are four nonprofit incorporated contractors' associations and five businesses engaged in general contracting work. The associations allege that a substantial number of their members desire to bid on contracts to be funded under the PWE Act, and on behalf of these members, allege that the MBE provision in Pub.L.No.95-28 and the rules and regulations thereunder issued constitute discrimination on the bases of race in the awarding of public funds in violation of the Fifth Amendment to the United States Constitution. The individual contractors allege that sufficient qualified[13] minority contractors do not exist to enable compliance with the MBE provision, and that the MBE provision increases the bid price which such contractors must submit. There is no allegation that any plaintiff has requested the Local Defendants to seek a "waiver" of the MBE provisions of Sec. 317.19(b)(1) of the rules and regulations pursuant to § 317.19(b)(2) thereof. 42 Fed.Reg. 27432 at 27435 (May 27, 1977.)[14]

III

ADMINISTRATIVE REMEDY
Defendants' initial contention is that the waiver procedure authorized in § 317.19(b)(2) of the rules and regulations, and set forth in the MBE Guidelines, affords an administrative remedy which renders unmeritorious plaintiffs' allegation that there is an insufficient number of qualified MBEs in the Los Angeles area.[15]
While the Court recognizes the conflict in authorities dealing with the question of exhaustion of administrative remedies when a constitutional claim is at issue [K. Davis, Administrative Law of the Seventies (1976), § 20.04], it is apparent that the seeking of a waiver of the applicability of the MBE provision would result simply in circumvention of the issue which plaintiffs seek to have resolved. Plaintiffs complain of injury under an allegedly unconstitutional statute, and "[a]djudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies." Oestereich v. Selective Service Board, 393 U.S. 233, 242, 89 S.Ct. 414, 419, 21 L.Ed.2d 402 (1968) (citations omitted). The purposes of the exhaustion doctrine, avoidance of interruption of the agency's duty to apply a statute in the first instance, development of the factual background upon which decisions should be based, and deference to the agency's discretion and expertise, McKart v. United States, 395 U.S. 185, 193-94, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969), are not served by requiring constitutional issues to be argued before an administrative agency.
No further development of the facts is necessary in this case; no administrative discretion is involved; no determination of the applicability of the MBE provisions to plaintiffs is needed. Unlike the claim in Montana Chapter of Association of Civilian Technicians, Inc. v. Young, 514 F.2d 1165 (9th Cir. 1975), plaintiffs' primary claim before this Court is the infringement upon their Constitutional rights. In Young, supra, *962 the claim was for a declaration that certain issues upon which defendant refused to negotiate were in fact the proper subject for negotiation pursuant to an Executive Order. Thus, "[t]he necessity of deciding the constitutional issues may well . . . [have been] avoided by the grant of alternative administrative relief,"[16] because the Constitutional issue would never arise if the agency determined that the issues were negotiable. In the case here before us, the Constitutional issue has arisen, but it may never be decided if it is insisted that plaintiffs go before an administrator and ask him to rule upon something which he has no authority to decide. See also Public Utilities Commission v. United States, 355 U.S. 534, 539-40, 78 S.Ct. 446, 451, 2 L.Ed.2d 470 (1958) (United States not required to exhaust state administrative remedy; "an administrative proceeding might leave no remnant of the constitutional question . . .. [b]ut where the only question is whether it is constitutional to fasten the administrative procedure onto the litigant, the administrative agency may be defied and judicial relief sought as the only effective way of protecting the asserted constitutional right.")
Further, the administrative remedy to be pursued here belongs to the Local Defendants, not to plaintiffs: the MBE Guidelines state that "[o]nly the Grantee can request a waiver." MBE Guidelines, p. 14. Thus, while plaintiffs may ask the Local Defendants to request a waiver, this possibility obviously allows plaintiffs no control over either the decision to seek a waiver or its presentation to the Secretary. Such a procedure hardly affords any administrative remedy which could preclude judicial determination of plaintiffs' claim.
In addition to arguing that the exhaustion doctrine precludes standing, defendants contend that plaintiffs have suffered no injury at this point in the administration of Round II. With respect to associational standing, the Supreme Court said in Warth v. Seldin, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975),
"[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members. E. g., National Motor Freight Assn. v. United States, 372 U.S. 246, [83 S.Ct. 688, 9 L.Ed.2d 709] (1963). . . . The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit. [citation omitted] So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction."
Plaintiff contractors, and contractors represented by associations, which are before this Court are clearly suffering the immediate, threatened injury of bidding on construction contracts on terms with which they are unfamiliar, of distinguishing between subcontractors on grounds allegedly unrelated to the characteristics upon which contractors normally employ subcontractors, and submitting bids higher than they otherwise might expect to submit. Plaintiff subcontractor, and subcontractors represented by associations, are threatened with being denied a prescribed percentage of the construction dollar in Los Angeles County due to the application of the MBE provisions.
In Warth v. Seldin, supra, the Supreme Court held that an association of firms engaged in residential construction lacked standing to challenge the constitutionality of a city ordinance which allegedly precluded persons of low and moderate income from residing in the city. The Court ruled *963 that, because the association sought damages rather than declaratory or injunctive relief, any injury was peculiar to the individual member, and would necessitate individual proof. The Court also held that there had been no averment that the ordinance had been responsible for the denial of a building permit for any specific project contemplated by the association. In the case before this Court, however, plaintiffs seek injunctive and declaratory relief from a provision which allegedly removes them from consideration for an identified percentage of construction funds targeted for specific, planned projects. Thus, injury to plaintiffs is clear, and they have standing to bring this action.
Moreover, this case presents "a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." Aetna Life Insurance Co. v. Haworth, 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937). This Court rejects Federal Defendants' argument that facial constitutional invalidity can never be asserted where there is a waiver provision. Accordingly, there is a justiciable controversy between plaintiffs and defendants which is appropriate for judicial determination.
The Court also notes that laches is inapplicable to this case. Plaintiffs brought this action five days after the September 30, 1977, deadline for obligating the entire $4 billion in PWE Act funds appropriated by Congress. Any earlier action by plaintiffs would not have defined a concrete controversy, since additional projects might have been approved by the Secretary until September 30. The test of laches is prejudice to the opposing party. Gutierrez v. Waterman Steamship Corp., 373 U.S. 206, 215, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963). Federal Defendants are not prejudiced in this case because they have fully performed their function of granting and obligating the funds appropriated and approving the necessary projects. Local Defendants offer no indication of prejudice flowing from the timing of the filing of this action, as opposed to prejudice flowing simply from the filing of the action.

IV

CONSTITUTIONAL DUE PROCESS AND EQUAL PROTECTION
The gravamen of plaintiffs' complaint is that the MBE provisions infringe upon their rights to due process of law, by creating a classification which denies the granting of Federal construction funds solely on the basis of race. Although the Fifth Amendment to the United States Constitution does not contain an equal protection clause, discrimination which contravenes the Equal Protection Clause of the Fourteenth Amendment violates the due process clause of the Fifth Amendment. Johnson v. Robison, 415 U.S. 361, 364, n.4, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974); Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954).
The initial question confronting this Court is whether the MBE provisions in fact create a "classification" or whether they constitute a "remedy" for past discrimination. Programs which eliminate discrimination are clearly necessary, and have been judicially decreed or approved to dismantle dual school systems which impermissibly perpetuate separation of the races in public schools. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). Further, Title VII of the Civil Rights Act of 1964[17] has been held to mandate the award of retroactive seniority to victims of discrimination in hiring on the basis of race, Franks v. Bowman Transportation Co., 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), and a state redistricting plan, which was drawn with racial considerations aimed at correcting past discrimination, has been upheld under the Voting Rights Act of 1965 and found not to contravene the Fourteenth Amendment. United Jewish Organizations, Inc. v. Carey, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977). Thus, it is clear that, *964 "[j]ust as . . . race . . . must be considered in determining whether a constitutional violation has occurred, so also must race be considered in formulating a remedy." North Carolina State Board of Education v. Swann, 402 U.S. 43, 46, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586 (1971).
However, it is also clear that a generalized assertion of "remedy" cannot exempt a racial classification from careful judicial examination, lest such an assertion be invoked as justification for obviously invidious discrimination. In fashioning a remedy for racial discrimination, there must be no discrimination against innocent non-minorities. In United Jewish Organizations, Inc. v. Carey, 430 U.S. 144, 165, 97 S.Ct. 996, 1009, 51 L.Ed.2d 229 (1977), Justice White, with Justices Stevens and Rehnquist concurring, stated:
"There is no doubt that in preparing the 1974 legislation, the State deliberately used race in a purposeful manner. But its plan represented no racial slur or stigma with respect to whites or any other race, and we discern no discrimination violative of the Fourteenth Amendment . . .."
In the case before this Court, there is no doubt that nonminority contractors and subcontractors are denied a specified percentage of Federal funds solely on the basis of their race. In addition to depriving these plaintiffs of equal treatment under the PWE Act, the MBE provisions, as a result of their asserted role in remedying "past discrimination," indicate that plaintiffs are members of an industry guilty of a history of discrimination against minorities, a contention which has not been substantiated in this case.
Moreover, at least in the area of desegregation, the Supreme Court has suggested that the school desegregation remedies there discussed may be limited to the specific context of achieving unitary public school systems:
"It would not serve the important objective of Brown I [Brown v. Board of Education, 347 U.S. 483 [74 S.Ct. 686, 98 L.Ed. 873] (1954)] to seek to use school desegregation cases for purposes beyond their scope, although desegregation of schools ultimately will have impact on other forms of discrimination." Swann v. Charlotte-Mecklenburg Board of Education, supra, 402 U.S. at 22-23, 91 S.Ct. at 1279.
The remedies discussed in the above-mentioned cases also appear to be directed only at eliminating the racial injustice practiced, rather than at attempting to establish an arbitrary level of compensation which will counterbalance prior wrongs. In this respect, Kahn v. Shevin, 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974), and Califano v. Webster, 430 U.S. 313, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977), are inapposite, since they deal with classification on the basis of gender, rather than race. Hence, this Court concludes that the MBE provisions constitute a purely racial classification and must be examined as such.
It should also be noted at this point that, while the Supreme Court has recognized that the Fourteenth Amendment was precipitated by discrimination against Blacks [Strauder v. West Virginia, 100 U.S. 303, 306, 25 L.Ed. 664 (1879); Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 71-72, 21 L.Ed. 394 (1873)], its protection extends to all races, including whites. Shelley v. Kraemer, 334 U.S. 1, 22, 68 S.Ct. 836, 92 L.Ed. 1161 (1948); Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 72, 21 L.Ed. 394 (1873). See also United Jewish Organizations, Inc. v. Carey, supra, 430 U.S. at 165, 97 S.Ct. 996; Bakke v. Regents of the University of California, 18 Cal.3d 34, 51, 132 Cal.Rptr. 680, 553 P.2d 1152 (1976), outlawing a race quota in medical school, and McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), holding that 42 U.S.C. § 1981 prohibits private employment discrimination against whites as well as nonwhites.
Classifications based solely upon race must be subjected to the most rigid *965 judicial scrutiny. Loving v. Virginia, 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); Bolling v. Sharpe, supra, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954); Korematsu v. United States, 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194 (1944); Hirabayashi v. United States, 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943). In related circumstances, this scrutiny has been held to require that the government must establish a compelling governmental interest for the classification, which interest is unrelated to race, and show that there are no alternative means to advance that interest which would impose a lesser burden on the group disadvantaged. Loving v. Virginia, 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); Dunn v. Blumstein, 405 U.S. 330, 337, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Constructors Association of Western Pennsylvania v. Kreps, 441 F.Supp. 936 (W.D.Pa., 1977); Bakke v. Regents of the University of California, supra, 18 Cal.3d at 49, 132 Cal.Rptr. 680, 553 P.2d 1152.
The legislative history of the PWE Act indicates that it was intended "to help revitalize the Nation's financially-pressed communities and reactivate the distressed construction industry with its hundreds of thousands of jobless workers . . .." H.R.Rep.No.95-20, 95th Cong., 1st Sess. 1 (1977).[18]
While the legislative history includes no mention of the MBE provisions, Federal Defendants cite the Court to the remarks of Representative Mitchell, sponsor of the MBE amendment on the floor of the House of Representatives, which indicate a desire to correct the situation in which minority businesses are given only 1 percent of all government contracts in any fiscal year. 123 Cong.Rec.H. 1436-1437.[19] Congress apparently became concerned with unemployment in minority communities and the rate of dissolution of minority businesses, mainly by the persuasive rhetoric of Congressman Mitchell, but no study was made and there is no legislative history of this Mitchell Amendment.
The Court recognizes the laudable goal of directing aid to that portion of the community which is suffering from severe unemployment. However, the MBE provision does not advance a governmental purpose unrelated to race. In fact, it is based on race alone  an invidious race quota. It is not contended here that minority business enterprises are more capable than nonminority businesses. No racially neutral justification is offered for the MBE provisions. Indeed, the specific objective asserted for this classification is the preference of one group of races over another. It is not a permissible governmental objective to direct financial assistance to segments of the community which are classified solely on the basis of race to the exclusion of other segments.
Moreover, the "remedy" versus "classification" distinction is inapplicable in this situation, where no discrimination against the minority business enterprises sought to be assisted by this legislation has been alleged. Federal Defendants have contended that a Congressional desire to remedy prior discrimination is "implicit" in Congressman Mitchell's remarks, but no specific evidence of such discrimination was shown by him, nor has any such evidence been offered by Federal Defendants, or any parties to this lawsuit.
Further, the MBE provisions fail the second part of the compelling governmental interest test, since underemployed minorities in the construction industry could be aided by racially neutral legislation having less of a detrimental impact upon nonminority contractors. For example, the 10 percent set-aside could be directed at those businesses which have experienced a low prescribed level of unemployment or income within the preceding year, and the Department of Commerce could take affirmative *966 steps to ensure that businesses in geographical areas of high unemployment become particularly aware of Federally funded projects which were being planned and to familiarize such businesses with the larger general contractors which customarily bid on Federally funded projects.
Prior to and at the hearing on Summary Judgment, Federal Defendants supplied the Court with an Opinion and Order of the Honorable Daniel J. Snyder, Jr., United States District Judge, 441 F.Supp. 936 (W.D.Pa. No. 77-1035, 1977), in the case of Constructors Association of Western Pennsylvania v. Kreps, a case with issues identical to ours. In that Opinion and Order, Judge Snyder denied a preliminary injunction on the grounds that while the same 10% racial quota for subcontractors deserved the strictest scrutiny of the Court since it is inherently constitutionally suspect, id. at 950, nevertheless, and while viewing the lack of legislative history as "troublesome," he concluded that the 10% quota based on race alone "is the only effective way to crack the competitive barriers and end the cycle which continually excludes minority businesses from proportionate participation." Id. at 953, 945, 942-944. To this conclusion, I take exception and therefore, with his Opinion and Order I disagree, with all due respect and humility. Perhaps the Bakke case now before the Supreme Court on certiorari will settle the matter for both Judge Snyder and this Court. Bakke v. Regents of the University of California, 18 Cal.3d 34, 132 Cal.Rptr. 680, 553 P.2d 1152 (1976), cert. granted, 429 U.S. 1090, 97 S.Ct. 1098, 51 L.Ed.2d 535 (1977), argued before the United States Supreme Court, 1977. ___ U.S. ___, 98 S.Ct. 46, 54 L.Ed.2d 67.
Quotas are absolutely invidious and unconstitutional. Whether used to exclude minorities as in the old collegiate 10% quota system, or used to include minorities under this new public works subcontractors 10% quota system, as here, every quota based on race or national origin alone is constitutionally invalid and impermissible. In this situation the "10% quota-ed" persons are the stigmatized, and the remaining "non quota-ed" persons are the illegitimatized, whether hurt or helped. All discrimination solely on the basis of race or national origin, direct or reverse, converse or inverse, is invidious and unconstitutional.
Affirmative action and goals are permissible; race quotas are not. It is simple as that, but even worse and inevitably, race quotas do not achieve or even approach the goals desired  personal, familial, economic, educational, recreational and all kinds of human equality, regardless of race or national origin.
Equal protection and non-discrimination in every phase and activity of human life is mandated by equal protection to all persons guaranteed in the Federal Constitution. Race quotas necessarily run counter to this Constitutional mandate and must be struck down if this Court, and indeed all of us, are to live under and abide by the United States Constitution.

V

THE APPLICABILITY OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, SECTIONS 601 AND 602, 42 U.S.C. §§ 2000d and 2000d-1
Title VI of the Civil Rights Act of 1964, Sec. 601, 42 U.S.C. § 2000d[20] provides that no *967 person in the United States shall on the ground of race, color, or national origin be excluded from, denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. This unequivocal statutory statement by Congress of the Constitutional guarantee of equal protection and non-discrimination solely on the basis of race, color, or national origin is specifically directed to be enforced by every Federal department or agency rendering Federal assistance to any program or activity. 42 U.S.C. § 2000d-1.[21] A plain uncomplicated reading of these two statutes would clearly invalidate the 10% "race quota" system set forth in the "race quota" law here in question, Public Law No. 95-28, Sec. 103(f)(2), 42 U.S.C. § 6705(f)(2),[22] and the rules and regulations issued by the Commerce Department thereunder especially Sec. 317.17(b), 42 Fed.Reg. 27432 at 27434-5.[23] But let us consider these statutes in the light of appropriate statutory construction.
The Court is aware of the general rules of statutory construction, which are hornbook law, and which are ordinarily controlling in a problem involving conflicting statutes:
(1) Where there is no clear intention to the contrary, a specific statute will not be controlled or nullified by a general one, irrespective of the priority of enactment.[24]

*968 (2) In resolving irreconcilable conflicts between successive statutory enactments, the later enactment should be given "primary consideration" over the prior.[25]
But the Court is compelled to go beyond the hornbook and must ascertain the purposes underlying any such conflicting enactments, and may not dispose of the problem solely by using such mechanical judicial slide-rules. Fanning v. United Fruit Co., 355 F.2d 147, 149 (4th Cir. 1966). The two hornbook principles are not to be applied when the results are "extraordinary,"[26] or when the results do not reflect the true "presumed intention of the law making body."[27] It follows that when an overriding public interest is demonstrably clear, in that the prior general statute sets forth the true Constitutional mandate, and the later specific statute is less conducive to the public welfare, then the public good controls and the general statute will invalidate the specific statute. So also will the prior invalidate the subsequent.
In our case here, where the prior statutes, 42 U.S.C. § 2000d and § 2000d-1, set forth in clear and unmistakable terms the overriding mandate of the Federal Constitution for equal protection and non-discrimination, they obviously express the true policy of the United States, the true intent of Congress, and the true Constitutional mandate. Any attempt to invalidate them by the "race quota" statute and rules and regulations thereunder would give us, indeed, extraordinary results. Thus, even though they are general and not specific and even though they are prior in time, the Court must necessarily uphold these general and prior statutes and decree the invalidity of the "race quota" system contained in the specific and subsequent 10% "race quota" law and regulations.
The legislative history of Title VI of the Civil Rights Act of 1964, and more particularly Sections 601 and 602, thereof, 42 U.S.C. §§ 2000d[28] and 2000d-1,[29] unmistakably and in the plainest of language, sets forth the Congressional mandate in enacting these two statutes. They codify into statutory formula the equal protection and non-discrimination guarantees of the Federal Constitution.
For instance, House Report No. 914, 88th Congress, 2d Session, in reporting H.R. 7152, later amended and then enacted as 42 U.S.C. § 2000d (Sec. 601 of Title VI of the Civil Rights Act of 1964) to the floor, printed out as "Purpose and Content," that Title VI "prohibits discrimination in any Federal financial assistance program."[30] And in the Sectional Analysis portion, the House Report emphatically proclaims as to Title VI:
"This title declares it to be the policy of the United States that discrimination on the ground of race, color, or national origin shall not occur in connection with programs and activities receiving Federal financial assistance and authorizes and directs the appropriate Federal departments and agencies to carry out this policy."[31]
*969 In stark contrast, the "race quota" provisions in Pub.L.No.95-28, Sec. 103(f)(2), 42 U.S.C. § 6705(f)(2) have absolutely no legislative history.[32] The most that the defendants can dredge up are the remarks of the Hon. Parren J. Mitchell (D.Md.), United States Congressman from Maryland, who for the first time on the floor of the House at the time of the debate upon Pub.L.No. 95-28, introduced the 10% "race quota" amendment which, after slight modification, has become Section 103(f)(2) of Pub.L.No. 95-28, 42 U.S.C. § 6705(f)(2). But, of course, this is not legislative history. It is only the debate rhetoric of a partisan who sponsored the amendment.
This is not astounding, because, as defendants admit, and as the legislative history of Pub.L.No.95-28 demonstrates, the amendment sponsored by Congressman Mitchell was never considered by the House or by the Judiciary Committee, and is not mentioned anywhere in House Report No. 914, which reported the Bill to the House Floor without Mitchell's amendment.
The "race quota" provisions in Pub.L.No. 95-28, Sec. 103(f)(2), 42 U.S.C. § 6705(f)(2), the specific and subsequent law, and in the regulations issued pursuant to it cannot be held to invalidate by any kind of theory or implication the overriding Congressional, National, and Constitutional policy in 42 U.S.C. § 2000d and d-1, mandating the Federal Constitutional guarantees of equal protection and non-discrimination, even though the "race quota" ostensibly is claimed to benefit minorities, which of course, it does not in reality do. On the contrary, it is a glaring and flagrant violation of both the Congressional intent and National policy, as well as the Constitutional mandate.
It follows that this Court is obliged to declare the "race quota" provision of Pub.L. No.95-28, Sec. 103(f)(2), 42 U.S.C. § 6705(f) (2), and the rules and regulations issued thereunder, especially Section 317.19, 42 Fed. Reg. 27432 at 27434-5, invalid and illegal under and by virtue of Title VI of the Civil Rights Act of 1964, Sections 601 and 602, 42 U.S.C. § 2000d and d-1.

*970 VI

PROPRIETY OF THE REMEDIES SOUGHT

(a) Declaratory Judgment

The Federal Judicial Code has since 1948, as amended in 1976, provided that "[i]n a case of actual controversy within its jurisdiction . . . any Court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201.
This statutory determination of the availability of declaratory relief "in a case of actual controversy" is, under Rule 57, Fed.R. Civ.P., available in accordance with all of the Federal Rules of Civil Procedure, including the Rule governing the entry of Summary Judgments, Rule 56, Fed.R.Civ.P. And the remedy of Declaratory Judgment is available "whether or not further relief is or could be sought." 28 U.S.C. § 2201.
As we have demonstrated heretofore, the case before us is a "justiciable controversy." See in this connection, 6A Moore's Federal Practice, Paragraph 57.-18[2] (2d ed. 1974, as kept up to date by the 1976-77 Cumulative Supplement) "Constitutionality of Public Acts," and cases there cited. The case before us concerns "the rights and other legal relations" of the plaintiffs under the unconstitutional provisions of Pub.L.No.95-28, Sec. 103(f)(2), 42 U.S.C. § 6705(f)(2). Not only have these unconstitutional 10% "race quota" provisions been applied, but they are clearly threatened to be applied in the future, and since the plaintiffs have standing, declaratory relief is properly, factually, and legally invoked here and should be issued, not only with regard to the unconstitutionality of Pub.L.No.95-28, Sec. 103(f)(2), 42 U.S.C. § 6705(f)(2), but also with respect to the relevant rules and regulations issued thereunder by the Federal Defendants, especially Section 317.19(b), 42 Fed.Reg. 27432, 27434-5. Based on race alone they are unconstitutional on their face and as applied; and we might add, since they are threatened to be applied in this situation, a declaratory judgment is obligatory.
Since we have also found that Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d and d-1 are applicable to invalidate Pub.L.No. 95-28, Sec. 103(f)(2), 42 U.S.C. § 6705(f)(2), declaratory relief should also be granted to plaintiffs upon this ground.

(b) Injunctive Relief

While the basic elements of injunctive relief are present here where we have an unconstitutional and illegal "10% race quota" system, the Affidavit of Arthur J. Sulvetta, Attachment N to Federal Defendants' Motion for Summary Judgment, makes it clear that any restraint retroactively or retrospectively applied would work a serious and irreparable injury upon the Local Defendants and upon the people and economy of Los Angeles County and Los Angeles City.
As Sulvetta, who is Chief, Program Analysis Division, Economic Development Administration, U.S. Department of Commerce and an apparently extremely well qualified economist, under oath declares, a nationwide total of $4 billion out of the $6 billion appropriated to date have been granted, including more than $57 million for the Local Defendants: $29,782,108 for the City of Los Angeles and its departments, offices and projects; and $28,109,085 for the County of Los Angeles, and its departments, offices and projects.
Moreover, Sulvetta estimates that those projects will generate approximately 5,613 to 6,068 person-years of jobs, involving 1,910,901 hours of employment, the equivalent of a full year of employment for 1,517 construction workers, translated into 12,265 workers to be employed on these local projects. He further estimates 489 person-years in indirect jobs associated with *971 the construction industry here on these projects in Los Angeles City and County.
Finally, Sulvetta estimates that a one-year delay in project construction activities would increase costs an additional $7.6 million over and above the $59 million for the Local Defendants; and a two-year delay would result in $16.1 million increase in costs.
Founded as they are on reliable studies by the Rand Corporation and other equally reliable studies and statistics, Sulvetta's Affidavit convinces the Court that retroactive or retrospective application of injunctive relief would be in essence a financial, economic, and fiscal disaster for the Local Defendants, their residents, and their economies.
And, of course, Sulvetta's estimates are substantiated in every material respect by the affidavits submitted by the Local Defendants, specifying in some detail the public injury that would result if projects were held up for any length of time, consisting as they do of police facilities, schools, recreation centers, senior citizen facilities, storm drains, sewerage facilities, flood control projects, hospital additions, medical and surgical augmentations, fuel storage facilities, landscaping, and numerous other public works.
We are thus fully aware of the tremendous detriment and harm that necessarily would befall the defendants if any injunctive relief were to be made retroactive, as so clearly demonstrated by the most recent affidavits of the defendants and the acts of the plaintiffs themselves by their undue delay and even fault in filing their action and in failing and refusing to bid, even though they were under the clear threat of the defendants to deny awards to any such bids. This awareness obliges this Court to apply any injunctive relief solely and only in the future and prospectively. This is not to say that the statute is not unconstitutional for we have already held that it is. But the Court does have equitable discretion to consider all of the circumstances in determining how far reaching and in what time frame restraint should be ordered. The Court finds and concludes that it should operate only in the future, balancing as it must the needs of and detriment that might be suffered on both sides, depending on the prospective or retroactive thrust of injunctive relief.
It is abundantly clear, therefore, that the injunctive relief in the Judgment should be fashioned so as to apply only prospectively in accordance with the principles laid down by the Supreme Court in Linkletter v. Walker, 381 U.S. 618, 627-29, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), and Chicot County District v. Bank, 308 U.S. 371, 374, 60 S.Ct. 317, 84 L.Ed. 329 (1940). In fashioning this prospective injunctive application we should keep in mind two dates today, October 31, 1977, with respect to the Federal Defendants, and December 31, 1977, with respect to the Local Defendants.
And just as absolutely clear from the Sulvetta Affidavit it is that no injunctive relief should be issued, applied, or even contemplated with respect to Federal grants made to local agencies throughout the United States, other than the Local Defendants. To do so would be to pass judgment on some $4 billion worth of projects and controversies throughout the nation with totally unacceptable and undoubtedly baleful consequences. It is wholly repugnant to this Court, and, of course, will not be ordered.

VII

ORDER
By reason of the foregoing Decision, Findings of Fact and Conclusions of Law it is hereby ordered that judgment be entered for plaintiffs and against defendants for declaratory relief and permanent injunction in accordance herewith.
LET JUDGMENT BE ENTERED ACCORDINGLY.

Appendices to follow.

*972 APPENDIX A

*973 
*974 
*975 
*976 
*977 
*978 
*979 
*980 
*981 

*982 APPENDIX B

*983 
*984 
*985 
*986 
*987 
*988 
*989 
*990 
*991 
*992 
*993 
*994 
*995 
*996 

*997 APPENDIX C

*998 
*999 
*1000 
*1001 
*1002 
*1003 
*1004 
*1005 
*1006 

*1007 APPENDIX D

*1008 
*1009 
*1010 
*1011 
*1012 
*1013 
*1014 
*1015 
*1016 
*1017 
*1018 
*1019 
*1020 
*1021 
*1022 
*1023 
*1024 
*1025 
*1026 
*1027 
*1028 
*1029 
*1030 
*1031 
*1032 
*1033 
*1034 
*1035 
*1036 
*1037 
*1038 
*1039 
*1040 
*1041 
*1042 
*1043 

*1044 SUMMARY JUDGMENT FOR DECLARATORY AND INJUNCTIVE RELIEF
The Court having duly considered the entire record herein; having examined in detail all of the evidence by way of affidavits, submissions and attachments filed by all parties hereto; having heard and analyzed the arguments presented at the oral hearing on motions and counter motions for summary judgment; and having made and entered its Decision and Order, including findings of fact and conclusions of law, finding on the basis of the entire record that there is no genuine issue of material fact and concluding that the "10% quota" mandated by Section 103(f)(2) of Public Law No. 95-28  "Public Works Employment Act of 1977"  enacted May 13, 1977, amending Section 106 (42 U.S.C. § 6705) of the "Local Public Works Capital Development and Investment Act of 1976" (42 U.S.C. § 6701 et seq.) by adding a new subsection 42 U.S.C. § 6705(f)(2), and the rules and regulations implementing said statute issued by the delegate of the Secretary of Commerce, through the Economic Development Administration of the Commerce Department, especially Section 317.19, 42 Fed.Reg. 27432 at 27434-5, in what is termed "Round II of the Local Public Works Capital Development and Investment Program," are, and each is unconstitutional and illegal under the United States Constitution particularly Amendment V thereof, and Title VI of the Civil Rights Act of 1964, particularly 42 U.S.C. §§ 2000d and 2000d-1; and good cause thereby appearing,
IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:
1. The Court hereby issues its Declaratory Judgment declaring and determining that said Section 103(f)(2) of Public Law No. 95-28, 42 U.S.C. § 6705(f)(2), and the rules and regulations issued thereunder and relating thereto, especially Section 317.19, 42 Fed.Reg. 27432 at 27434-5, are and each is in and of themselves on their face and as applied here, unconstitutional under the United States Constitution, including the Fifth Amendment thereof as a denial of equal protection of the laws and as invidious and impermissible provisions for a race quota; and that the said statute and rules and regulations, and the race quota thereby mandated, are illegal, contrary to law and arbitrary, capricious and unreasonable, as violations of Title VI of the Federal Civil Rights Act of 1964, 42 U.S.C. § 2000d and 2000d-1.
2. A permanent injunction is hereby issued permanently restraining the Federal Defendants therein, the Secretary of Commerce of the United States, the United States Department of Commerce, the Assistant Secretary of Commerce for the Economic Development Administration and their delegates from enforcing, applying, carrying out or implementing in any manner whatsoever, directly or indirectly, including the allocation or grant of Federal funds authorized in the future, the provisions of said Public Law No. 95-28, Sec. 103 (f)(2), 42 U.S.C. § 6705(f)(2), and the said rules and regulations issued thereunder, especially Section 317.19, 42 Fed.Reg. 27432 at 27434-5, from and after October 31, 1977. This injunction shall not govern or apply to Federal funds heretofore granted or to any actions by the Federal Defendants with respect to such funds heretofore granted.
3. A permanent injunction is hereby issued permanently restraining the Local Defendants herein, Los Angeles County, a body corporate and politic, Los Angeles County Board of Supervisors, Los Angeles Flood Control District, Los Angeles County Engineer, Facilities Department of Los Angeles County, City of Los Angeles, a municipal corporation, Los Angeles City Council, Department of Recreation and Parks of the City of Los Angeles, and the Department of Public Works of the City of Los Angeles, from enforcing, applying, carrying out, or implementing directly or indirectly in any manner whatsoever, including the devising, approving, advertising or awarding of bids, the provisions of said statute and said rules and regulations, from and after January 1, 1978. This injunction shall not govern or apply to Federal funds heretofore granted or to any actions by Local Defendants with respect to such funds heretofore granted.
NOTES
[1] 1977 U.S.Code Cong. & Admin.News, 91 Stat. 116, at p. 117 (June, 1977) 42 U.S.C. § 6705(f)(2). For full text of Pub.L.No. 95-28, see Appendix A attached.
[2] Chap. III, Part 317, especially Section 317.19(b), 42 Fed.Reg. Sec. 317(b)(2), 27432 at 27434-5 (May 27, 1977). For full text of the rules and regulations, see 42 Fed.Reg. 27432-27440, Appendix B attached.
[3] 1976 U.S.Code Cong. & Admin.News, Vol. 3, pp. 1746-7 (1976). For full text see pp. 1746-1767.
[4] See footnote 1, supra.
[5] Pub.L.No.95-29, 1977 U.S.Code Cong. & Admin.News, 91 Stat. 122 at pp. 123-4 (June 1977). For full text see Appendix A attached.
[6] See legislative history of Pub.L.No.95-28, particularly H.Rep.No.95-20 (p. 1), 1977 U.S. Code Cong. & Admin.News, p. 150. For full text see footnote 18, infra, and Appendix D attached.
[7] See footnote 1, supra, and Appendix A.
[8] These, of course, are the remarks of Hon. Parren J. Mitchell (D.Md.) who introduced this provision as an amendment from the floor during debate on the PWE. For full text, see Appendix C attached.
[9] These "Guidelines" of the EDA are not published anywhere that the Court can find, and are drawn from attachments to the Federal Defendants' briefs and affidavits herein, but, apparently, they were made available, if asked for, to the Local Defendants as applicant grantees for the Federal funds under Round II.
[10] "(b) Minority business enterprise.

(1) No grant shall be made under this part for any project unless at least ten percent of the amount of such grant will be expended for contracts with and/or supplies from minority business enterprises.
(2) The restriction contained in paragraph (1) of this subsection will not apply to any grant for which the Assistant Secretary makes a determination that the ten percent set-aside cannot be filled by minority businesses located within a reasonable trade area determined in relation to the nature of the services or supplies intended to be procured."
[11] See footnote 9, supra.
[12] For Pub.L.No.95-29, see 1977 U.S.Code Cong. & Admin.News, June 1977, enacted May 13, 1977, 91 Stat. 122 at 91 Stat. pp. 123-124. Appendix A has full text.
[13] "Qualified" is defined in the MBE Guidelines, pp. 3-4.
[14] See footnote 2, supra, Appendix B for full text.
[15] The effect of plaintiffs' failure to pursue this alleged procedure is also an important aspect of all defendants' arguments that plaintiffs lack standing to bring this action and that the case is not ripe for judicial review, since only claimed final agency action is subject to review under the Federal Administrative Procedure Act. 5 U.S.C. § 704.
[16] Montana Chapter of Ass'n of Civilian Technicians, Inc. v. Young, 514 F.2d 1165, 1167-68 (9th Cir. 1975).
[17] 78 Stat. 253, as amended, 42 U.S.C. § 2000e et seq.
[18] 1977 U.S.Code Cong. & Admin.News, June 1977, pp. 150-184. For full text see Appendix D attached.
[19] See footnote 8, supra, for floor debate when Congressman Mitchell introduced these "race quota" provisions as an amendment on February 24, 1977. Appendix C has full text.
[20] The full text follows:

§ 2000d. Prohibition against exclusion from participation in, denial of benefits of, and discrimination under Federally assisted programs on ground of race, color, or national origin
No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.
Pub.L. 88-352, Title VI, § 601, July 2, 1964, 78 Stat. 252.
Historical Note
Legislative History. For legislative history and purpose of Pub.L. 88-352, see 1964 U.S.Code Cong. and Adm.News, p. 2355.
[21] Full text (italics added):

§ 2000d-1. Federal anthority and financial assistance to programs or activities by way of grant, loan, or contract other than contract of insurance or guaranty; rules and regulations; approval by President; compliance with requirements; reports to Congressional committees; effective date of administrative action
Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 2000d of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: Provided, however, That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.
Pub.L. 88-352, Title VI, § 602, July 2, 1964, 78 Stat. 252.
Historical Note
Equal Opportunity in Federal Employment. Nondiscrimination in government employment and in employment by government contractors and subcontractors, see Ex.Ord. No.11246, Sept. 24, 1965, 30 F.R. 12319 and Ex.Ord. No. 11478, Aug. 8, 1969, 34 F.R. 12985, set out as notes under section 2000e of this title.
Legislative History. For legislative history and purpose of Pub.L. 88-352, see 1964 U.S.Code Cong. and Adm.News, p. 2355.
[22] Full text is referenced in footnote 1 supra, and appears in Appendix A.
[23] Full text is referenced in footnote 2 supra, and appears in Appendix B.
[24] Morton v. Mancari, 417 U.S. 535, 550-51, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974); Bulova Watch Co. v. United States, 365 U.S. 753, 758, 81 S.Ct. 864, 6 L.Ed.2d 72 (1961).
[25] Araya v. McLelland, 525 F.2d 1194, 1196 (5th Cir. 1976).
[26] Shelton v. United States, 83 U.S.App.D.C. 32, 35, 165 F.2d 241, 244 (1947).
[27] United States v. Windle, 158 F.2d 196, 199 (8th Cir. 1946).
[28] Full text at footnote 20, supra.
[29] Full text at footnote 21, supra.
[30] 1964 U.S.Code Cong. & Admin.News, pp. 2391-2394, at 2391. For full text see Appendix E attached.
[31] In full, the Sectional Analysis of Title VI, 1964 U.S.Code Cong. & Admin.News, pp. 2400-2401, APPENDIX E, follows:

TITLE VINONDISCRIMINATION IN FEDERALLY ASSISTED PROGRAMS
General
This title declares it to be the policy of the United States that discrimination on the ground of race, color, or national origin shall not occur in connection with programs and activities receiving Federal financial assistance and authorizes and directs the appropriate Federal departments and agencies to take action to carry out this policy. This title is not intended to apply to foreign assistance programs.
Section 601.  This section states the general principle that no person in the United States shall be excluded from participation in or otherwise discriminated against on the ground of race, color, or national origin under any program or activity receiving Federal financial assistance.
Section 602 directs each Federal agency administering a program of Federal financial assistance by way of grant, contract, or loan to take action pursuant to rule, regulation, or order of general applicability to effectuate the principle of section 601 in a manner consistent with the achievement of the objectives of the statute authorizing the assistance. In seeking to effect compliance with its requirements imposed under this section, an agency is authorized to terminate or to refuse to grant or to continue assistance under a program to any recipient as to whom there has been an express finding pursuant to a hearing of a failure to comply with the requirements under that program, and it may also employ any other means authorized by law. However, each agency is directed first to seek compliance with its requirements by voluntary means.
Section 603 provides that any agency action taken pursuant to section 602 shall be subject to such judicial review as would be available for similar actions by that agency on other grounds. Where the agency action consists of terminating or refusing to grant or to continue financial assistance because of a finding of a failure of the recipient to comply with the agency's requirements imposed under section 602, and the agency action would not otherwise be subject to judicial review under existing law, judicial review shall nevertheless be available to any person aggrieved as provided in section 10 of the Administrative Procedure Act (5 U.S.C. 1009). The section also states explicitly that in the latter situation such agency action shall not be deemed committed to unreviewable agency discretion within the meaning of section 10. The purpose of this provision is to obviate the possible argument that although section 603 provides for review in accordance with section 10, section 10 itself has an exception for action "committed to agency discretion," which might otherwise be carried over into section 603. It is not the purpose of this provision of section 603, however, otherwise to alter the scope of judicial review as presently provided in section 10(e) of the Administrative Procedure Act.
[32] We search in vain for any legislative history on Pub.L.No.95-28, Sec. 103(f)(2), 42 U.S.C. 6705(f)(2), although as we have seen there is voluminous legislative history on Pub.L.No.95-28 itself. See footnote 18, supra, for reference and Appendix D for full text.