381 So.2d 849 (1980)
J. K. HAYNES et al.
v.
LOUISIANA TEACHERS ASSOCIATION et al.
No. 13059.
Court of Appeal of Louisiana, First Circuit.
January 21, 1980.
Rehearing Denied March 31, 1980.
Writ Refused May 19, 1980.
*850 Nelson D. Taylor, Baton Rouge, of counsel, for plaintiffs-appellants J. K. Haynes et al.
William R. D'Armond, Baton Rouge, and Arthur G. Thompson, Shreveport, of counsel, for defendants-appellees Louisiana Teachers Ass'n et al.
Before COVINGTON, LOTTINGER and COLE, JJ.
COVINGTON, Judge.
This is an appeal from a judgment of the trial court signed on May 18, 1979, granting defendants' motion for summary judgment and dismissing plaintiffs' suit at their costs. We affirm.
This suit arises out of a petition for declaratory judgment and injunctive relief filed by a number of petitioners, namely J. K. Haynes, R. J. Neville, Emily Stewart, Willie Climmons, George Thomas, James Edwards, Audrey N. O'Connor, Grady Murphy, Sidney A. Perkins, D. V. Tolliver, Eugene Johnikins, Franchey P. Truewell, Lamarr Davis, Lionel Dawson, Philip N. Malcolm, Jr., Hamp Smith, William Ruffin, B. J. Franklin, P. A. Frazier, Lee Edward Joe, Thomas J. Bailey, Charlie Taylor, Jr., Michael Dupre, Frank B. Ross, Carrie Lee Thomas, Kingsley B. Garrison, Sylvester Muckelroy, Emily J. Stewart, Alex Nicholas, Percy L. Wallace, Leon Burns, Mary M. Slaughter, Arcola S. Haney, Emanuel L. Prout, Ralph Plaisance, Albert Joseph, John Frank Guillory, Johnny Thomas, Willie V. Jackson, and Arthur J. Lewis. The plaintiffs sue individually and also as representatives of persons similarly situated who have a common interest in the lawsuit. They are allegedly voting members of the Louisiana Education Association (LEA), and officers of the LEA, and executive officers of local affiliate chapters of the LEA whose members are voting members thereof. The suit was brought against Louisiana Teachers Association (LTA), Louisiana Association of Educators (LAE), and certain named officers of LAE.
The controversy arose because the predominantly black teachers' organization, LEA, and the predominantly white teachers' organization, LTA, were formally consolidated into LAE. The consolidation successfully terminated some 70 years of separate and racially identifiable teacher organizations in Louisiana. The consolidation agreement, the LAE constitution and by-laws were approved by LEA and LTA and filed with the Secretary of State of the State of Louisiana on January 3, 1978.
In December of 1977, the appellants filed the present action for declaratory judgment and injunctive relief to block the consolidation. No order for injunctive relief was obtained, and the officials of the corporations proceeded with the consolidation. After the consolidation was effectuated the LEA's former executive secretary, J. K. Haynes (who had been discharged by the executive council of LEA prior to the consolidation) refused to turn over LEA's premises and property to LAE. LAE obtained injunctive relief against J. K. Haynes ordering him to turn over the premises and property to LAE. The injunction was upheld by this Court on appeal. Louisiana Association of Educators v. J. K. Haynes, Number 12,165 (in an unreported decision).
In this appeal the appellants make two basic contentions: (1) that the consolidation was invalid because LAE failed to comply with the Louisiana Nonprofit Corporation Law; and (2) that the minority guarantees in the consolidation agreement and in LAE's constitution and by-laws are unlawful as "racially restrictive covenants."
The record reflects unquestionably that the membership of LEA approved the consolidation by the requisite two-thirds majority. At the 1976 convention in Alexandria, the membership voted in favor of the consolidation or merger. The evidence shows that the members knew that they were voting for consolidation. Mr. Basile Miller, who had run on an anticonsolidation platform, was elected president of the LEA, but *851 Mr. Miller considered himself under mandate of the membership to move towards implementation of the expressed wishes of the membership. Without tracing all the steps with respect to the efforts of Mr. Miller, despite opposition from the Executive Council of LEA and Mr. Haynes, it will suffice to state that the membership at its next convention (November, 1977) elected a pro-consolidation slate of officers, with Mr. Jesse Spears as president, who immediately took action on November 23, 1977, to effectuate the wishes of the membership by taking all necessary actions to complete the consolidation requirements.
Accordingly, Mr. Spears, the new president of LEA, made demand upon Mr. Haynes to sign the necessary consolidation documents, but Mr. Haynes refused to do so. Then, on December 29, 1977, the LEA Executive Council met, after prior notice, in Alexandria. At the December meeting, Mr. Haynes was discharged as executive secretary and was replaced by Mr. Miller. The necessary documents effectuating the consolidation and the incorporation of LAE were then executed. Thereafter, on January 3, 1978, the agreement of consolidation and articles of incorporation for LAE were filed with the Secretary of State. On that same date the Secretary of State issued a certificate declaring the consolidation and a certificate of incorporation of LAE.
The appellants contend that there was actually no proper merger or consolidation of the two teachers' organizations because LSA-R.S. 12:243-246 were not complied with. We find, as did the trial court, that the appellants' contention in this respect is without merit.
The record reflects that the consolidation agreement and the articles of incorporation have been filed with the Secretary of State of the State of Louisiana, and a certificate of incorporation issued certifying that the LEA and LTA have been consolidated into the LAE. We find that the district court correctly ruled that the consolidation was not subject to attack by virtue of LSA-R.S. 12:205 B.
The Nonprofit Corporation Law makes the certificate of incorporation conclusive evidence of due incorporation. The validity of the incorporation of LAE can be directly attacked only by the State in a quo warranto proceeding; the incorporation cannot be collaterally attacked.
R.S. 12:205 B reads as follows:
"B. When all fees and charges have been paid as required by law, the Secretary of State shall record the articles or the multiple original thereof in his office, endorse thereon the date and, if requested, the hour of filing thereof with him, and issue a certificate of incorporation which shall show the date and, if endorsed on the articles, the hour of filing of the articles with him. The certificate of incorporation shall be conclusive evidence of the fact that the corporation has been duly incorporated, . . . except that in any proceeding brought by the state to annul, forfeit or vacate a corporation's franchise, the certificate of incorporation shall be only prima facie evidence of due incorporation." [Emphasis added.]
The predecessor of this provision, which contained similar words, was considered by the Court in Louisiana District Church of the Nazarene v. Church of the Nazarene, 132 So.2d 667 (La.App. 1 Cir. 1961). In that case, the Ponchatoula Church of the Nazarene split away from its parent church, and the parent church sued the defendant to recover title to the local property. The defendant argued that the parent church was not duly incorporated because its articles of incorporation were executed under private signature duly acknowledged rather than by authentic act as required by the statute. The Court ruled that the defendant could not raise the issue, and said:
". . . From the foregoing it would appear the possibility exists that the validity of plaintiff's incorporation might be subject to attack in a proper proceeding since plaintiff's Articles of Incorporation were not executed by authentic act as required by the previously mentioned statute. We herein express no opinion in *852 this regard, however, for the reason the present proceeding is not a proper one for determination of the question of plaintiff's corporate existence, as will hereinafter be shown.
"The Nonprofit Corporation Law of this state contains the following section:
"`L.S.A. R.S. 12:107. Validity and effect of certificate of incorporation
"`The certificate of incorporation issued by the Secretary of State in accordance with the provisions of this Chapter shall be conclusive evidence of the fact that the corporation has been duly incorporated, except in any proceeding brought by the state to annul, forfeit, or vacate the corporation's franchise, in which case the certificate of incorporation shall be only prima facie evidence of due incorporation.'
"This section is identical to the section of the Business Corporation Law dealing with the effect to be given to a certificate of incorporation (i. e. LSA-R.S. 12:10), and was taken from Section 9 of the Model Business Corporation Act sometimes known as the Uniform Corporation Act.
"[4, 5] These sections deny to all, including the State, the right to collaterally attack the existence of a corporation, reserving only to the State the right to attack corporate existence in a direct action. They further provide corporate existence is conclusively proved by the certificate of incorporation issued by the Secretary of State. There appears in the record such certification of plaintiff's corporate being and under the unambiguous provisions of the statute defendants may not collaterally attack same.
"As stated by Charles E. Dunbar and Eugene A. Nabors in their articles on `The Louisiana Business Corporations Law' in Volume 5 of LSA-R.S. Page XXXI at page XXXIX:
"`Sections 5 and 10 give certainty to the use of corporations by the establishment of a system which makes it practically impossible to collaterally attack a corporation's existence. The Attorney General, acting for the state in quo warranto proceedings can, of course, attack the validity of incorporation proceedings because of failure to comply with the requirements of the statute. Compliance with the requirement for filing the articles of incorporation with the recorder of mortgages brings the corporation into existence and enables it to go forward with regular business transactions which cannot be attacked by private parties even though there is failure to comply with any further formalities. In addition, the issue of the certificate of incorporation by the Secretary of State prevents private parties from attacking the validity of any of the incorporation formalities.'"
[Emphasis added.]
In the instant case, the Secretary of State issued a certificate of incorporation to LAE. Therefore, any deficiencies in the procedure leading to the issuance of that certificate cannot be raised by appellants. LSA-R.S. 12:205 B.
Although the appellants' attack purports to be on the consolidation rather than the incorporation of LAE, it amounts to an attack on LAE's incorporation. A consolidation is by definition the formation of a new corporation from two previously existing corporations, LSA-R.S. 12:242. The statutory procedures dealing with consolidation call for the preparation and filing of articles of incorporation for the new corporation, LSA-R.S. 12:244. The consolidation becomes effective when the consolidation agreement and articles of incorporation are recorded by the Secretary of State, LSA-R.S. 12:245 B; and, at that time the two consolidating corporations cease to exist, LSA-R.S. 12:246 B. Thus, the issuance of a certificate of incorporation to the new corporation is the end product of the consolidation procedure. The protection from attack by anyone other than the State that LSA-R.S. 12:205 B gives to the incorporation therefore necessarily applies to the consolidation procedure. The consolidation procedure is the incorporation procedure for the new corporation.
*853 The record shows that the consolidation agreement and LAE Articles of Incorporation were certified by the secretary of each corporation as having been approved by the members, and signed and acknowledged by each president. All of the appropriate documents were approved by both organizations, as discussed above. The LAE Articles of Incorporation were filed and recorded in the office of the Secretary of State and a certificate of incorporation was issued. LSA-R.S. 12:205 B provides that the certificate of incorporation is conclusive evidence of the fact that the corporation has been duly incorporated. Here, because of the unique circumstances, the memberships of all associations involved told the world what they wanted. The boards of the associations were bound by the mandates of their memberships. The will of the membership cannot be thwarted by failure of subordinate boards to comply with technical provisions of incorporation procedures.
The appellants also contend, as they did in the court below, that certain minority guarantee provisions of the consolidation agreement and the LAE constitution and by-laws were violative of their Fourteenth Amendment rights, federal statutory rights, and state constitutional rights in that they each allegedly contain "racially restrictive covenants."
In ruling on the minority guarantee provisions, the trial court said:
"It is clear that the minority guarantee provisions at issue here were in no sense intended to exclude a racial minority. Rather, they were designed to insure that members of the predominantly black teachers' association would be afforded a fair opportunity to participate in the affairs of the new association. The consolidation agreement, the LAE Constitution and the LAE By-Laws were written by a joint committee composed of an equal number of members from both former organizations. The guarantee provisions are to continue in effect for a six-year transitional period after consolidation and then, cease to operate. These benign transitional guarantees are remedial provisions designed to eradicate the effects of racially restrictive covenants that previously barred black teachers from participating in the dominant all-white teachers' association in Louisiana.
"Uses of minority guarantees to eliminate the present effects of past discrimination have been upheld as remedies for constitutional or statutory violations which resulted in identified race-based injuries. United States v. Jacksonville Terminal Company, 451 F.2d 418 (5th Cir. 1971), Hicks v. Crown Zellerbach Corporation, 310 F.Supp. 536 (E.D.La.1970), Lee v. Macon County, 283 F.Supp. 194 (M.D.Ala.1968). In United Jewish Organizations v. Carey [430 U.S. 144], 97 S.Ct. 996, [51 L.Ed.2d 229] (1977), the Supreme Court affirmed the use of racial criteria in redistricting, holding that New York's reapportionment plan did not violate the Fourteenth or Fifth Amendment merely because of the use of specific numerical quotas. In a later case, Regents of the University of California v. Bakke [438 U.S. 265], 98 S.Ct. 2733 [57 L.Ed.2d 750] (1978), the Court did strike down a medical school's admissions program which was based on racial quotas because the operation of the special admissions program preferred the designated minority groups at the expense of other individuals. The Court distinguished Bakke and United Jewish Organizations, reaffirming the use of `. . . measures to improve the previously disadvantaged group's ability to participate, without excluding individuals belonging to any other group from enjoyment of the relevant opportunity . . . `, 98 S.Ct. 2733 at 2756.
"The present case is in line with United Jewish Organizations. The transitional minority guarantees in the consolidation agreement are designed to insure members of both former organizations meaningful participation in the operation of the new association, the LAE. No one is excluded. None of the challenged provisions violate the Federal or State Constitution or 42 U.S.C. 1981. Therefore, the consolidation agreement, the LAE Constitution *854 and the LAE By-Laws are constitutionally valid and enforceable."
This matter is before the Court on a motion for summary judgment filed by the defendants. The plaintiffs also filed a motion for summary judgment. There are no material facts in dispute. LSA-C.C.P. art. 966.
We believe that it is important to recognize that the minority guarantees herein are not "racially restrictive covenants" as this phrase has been used to denote invidious arrangements designed to exclude members of a racial minority from participating in a particular activity. See Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). The minority guarantee provisions at issue here were in no sense intended to exclude a racial minority. Rather, they were intended to ensure that members of the predominately black teachers' association would be afforded a fair opportunity to participate in the affairs of the new association (which is approximately one-third black and two-thirds white). The guarantee provisions are to continue in effect for a transitional period, and then cease to have effect. These transitional guarantees are benign; they are remedial provisions intended to eradicate the effects of racially restrictive covenants that formerly barred black teachers from participating in the dominant, all-white teachers' association in Louisiana. Such benign transitional guarantees are sanctioned by the United States Supreme Court's recent decision in United Steelworkers of America, AFL-CIO-CLC v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). In Weber, the Court upheld Kaiser Aluminum's "affirmative action" plan (collective bargaining agreement) which reserved 50% of the places in a training program for blacks for a period of time. The Court emphasized that "the plan is a temporary measure; it is not intended to maintain racial balance, but simply to eliminate a manifest racial imbalance."
The use of minority guarantees to eliminate present effects of past discrimination has judicial sanction. In a variety of situations where a history of racial or minority discrimination is found to exist, the implementation of programs drawing racial or minority lines as a means of ensuring that the effects of past discrimination do not continue to deny equal opportunity to blacks or other minorities in the future have been sanctioned. Affirmative action of this kind has been approved in United Jewish Organizations of Williamsburgh, Inc. v. Carey, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977) (past history of discrimination in voting); Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) (past history of school segregation); Franks v. Bowman Transportation Company, Inc., 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976) (past history of employment discrimination); Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (2d Cir. 1968) (past history of housing discrimination); Local 53 of Ass'n of Heat & Frost I & A Workers v. Vogler, 407 F.2d 1047 (5th Cir. 1969) (past history of labor union membership discrimination).
Labor organizations are a prime example of previously segregated groups that have integrated in recent years through the use of court-sanctioned minority guarantees. In Hicks v. Crown Zellerbach, 310 F.Supp. 536 (E.D.La.1970), the Court, after finding that the maintenance of separate racial local unions for employees at Crown Zellerbach's paper mill violated Title VII of the Civil Rights Act of 1964, ordered immediate merger of the local unions with guarantees of black participation in the leadership of the local union over a transitional period.
The Fifth Circuit Court of Appeals has also recognized that transitional relief measures may be appropriate in United States v. Jacksonville Terminal Company, 451 F.2d 418 (5th Cir. 1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972), when the Court directed the district court to order the consolidation of labor union organizations during and after any necessary transition period. See also Long v. Georgia Kraft Co., 455 F.2d 331 (5th Cir. 1972), where the Court stated that protective *855 transitional measures may be an appropriate means of eliminating the present effects of past discrimination in labor union merger cases.
We hold that the minority guarantee provisions of the consolidation agreement and the LAE constitution and by-laws herein are lawful.
For the assigned reasons, this Court finds that the incorporation and consolidation were proper, and the consolidation agreement and the LAE constitution and by-laws were valid. The defendants-appellees were entitled to summary judgment. Accordingly, we affirm at appellants' costs.
AFFIRMED.